1

2

3

4

5

6

7

8

9          IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12   MICHAEL BRIONEZ, et al.,                    No. C 01-3969 CW

13            Plaintiffs,
                                                 ORDER DENYING
14        v.                                     DEFENDANTS'
                                                 MOTION FOR ENTRY
15   UNITED STATES DEPARTMENT OF                 OF ORDER THAT
     AGRICULTURE, et al.,                        DEFENDANTS HAVE
16                                               DISCHARGED THEIR
            Defendants.                          OBLIGATIONS UNDER
17                                               THE SETTLEMENT
     _____/         AGREEMENT, AND
18                                               GRANTING IN PART
                                                 AND DENYING IN
19                                               PART PLAINTIFFS'
                                                 MOTION FOR
20                                               CONTEMPT AND FOR
                                                 ENFORCEMENT OF
21                                               COURT-APPROVED
                                                 SETTLEMENT
22                                               AGREEMENT

23          Defendants move for entry of an order finding that they have

24   discharged their obligations under the Hispanic Settlement

25   Agreement (HSA or Agreement).  Plaintiffs oppose that motion, and

26   have filed their own motion for contempt and enforcement of the

27   Agreement.  Defendants oppose Plaintiffs' motion.

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    The matters were heard on February 10, 2006.  Having

2  considered all of the papers filed by the parties and oral argument

3  on the motions, the Court denies Defendants' motion and grants

4  Plaintiffs' motion in part and denies it in part.

5                            BACKGROUND

6    Plaintiffs filed this action in October, 2001, alleging that

7  Hispanics were under-represented in the workforce of the Pacific

8  Southwest Region of the Forest Service of the United States

9  Department of Agriculture (Region 5), as compared to applicable

10  Civilian Labor Force (CLF) statistics.  According to Plaintiffs,

11  this under-representation was based on Region 5's process for

12  hiring and promotion, which unlawfully discriminated against

13  Plaintiffs and other class members in violation of Title VII.

14    Less than a year later, in June, 2002, the parties entered

15  into the Agreement.  In October, 2002, the Court, following notice

16  and fairness proceedings, approved the Agreement.  The effective

17  date of the Agreement was December 22, 2002.

18    The Agreement required a Monitor, and, pursuant to the

19  Agreement, the parties selected Marcie Seville as the Monitor.  The

20  Agreement provided that the parties had to attempt to resolve with

21  the Monitor disagreements regarding compliance, before seeking

22  relief from this Court.

23    In May, 2005, Plaintiffs filed with the Monitor their Request

24  for Findings and Enforcement Recommendations.  Defendants submitted

25  an opposition and Plaintiffs then submitted a reply.  The Monitor

26  issued her Tentative Report in August, 2005.

27    On October 29, 2005, after Defendants lodged their objections

28                                2

to the tentative report, the Monitor issued her Report and

Recommendations of Court-Appointed Monitor.   The Monitor's Report

stated that:

> Defendants have not substantially complied with all
> provisions of HSA § IV.B-G., and § V, or with
> alternative methods of implementation agreed upon by the
> Parties.   Defendants' efforts at HSA implementation have
> been seriously hampered by continuing changes in key
> personnel and proposals for implementation followed by
> mid-stream changes in plans and strategies.   There have
> been ongoing delays in implementation -- or complete
> abandonment -- of the very measures that Defendants
> themselves have proposed to carry out their HSA
> obligations.   Defendants have not realized the stated
> intent of the HSA -- to eliminate barriers to hiring,
> promotion, and retention, and . . . they have not
> substantially complied with their obligations under the
> following HSA provisions:
>
> § IV.C (maintaining a full-time Region Recruitment
> Coordinator ("RRC") position, with the primary
> purpose of implementing the Recruitment Program,
> funded at a level enabling the RRC to accomplish the
> objectives of the HSA)
>
> § IV.D (making a good faith effort to maintain and
> fill the Civil Rights ("CR") Director during the HSA
> Term)
>
> § V.A.1(1)&(2) (having a Regional Recruitment Program
> designed to disseminate effective information
> relating to employment opportunities and to increase
> diversity of applicants by engaging in recruitment
> activities consistent with § IV obligations)
>
> § V.A.2 (monitoring all recruitment and promotion
> actions of Forest Supervisors and Regional Office
> Directors and all recruitment and promotion actions
> taken under their supervision)
>
> § V.A.3 (Employing alternatives agreed upon by the
> parties in any action to fill a competitive vacancy)
>
> § V.B.1(a) (Having the RRC responsible for
> coordinating outreach and recruitment)
>
> § V.B.2 (Giving the RRC access to specified data,
> including RNO information)
>
> The Monitor finds that Defendants are in substantial

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

compliance with: § IV.B (issuance of policy statement), § IV.E (Advertisement of Region 5 positions), § IV.F (retaining Monitor), § V.A.4 (as to recruitment from the Student Career Employment Program), and § V.C (Training).

As to § IV.G, which requires the Defendants to make a good faith effort to provide sufficient resources to meet the obligations under the HSA, the Monitor finds that substantial resources have been directed toward HSA efforts, but in some situations, the use of those resources has been misguided and has not furthered the Region's efforts to meet its HSA obligations.

The Monitor further finds that, in the more than two and one-half years since the effective date of the HSA, Defendants have failed to make substantial progress toward the § IV workforce parity goal. Although Region 5 is at or above parity in several professional series and program managers (GS 340), those series comprise a relatively small percentage of the permanent workforce. Most of the Region's progress is in the hiring of student trainees in firefighter apprenticeship positions, under the SCEP or Student Career Experience Program hiring authority. While successful in recruiting and selecting Hispanic applicants for that program, the Region has failed to take steps to address retention of those new hires and there has been significant attrition. Without consideration of the SCEP hires, the Region has made almost no progress in increasing Hispanic representation during the HSA term, and the Monitor concludes that the SCEP employees are not properly included in the permanent workforce. Based upon existing shortfalls of permanent Hispanic employees, and workforce projections, the Monitor finds that there is little or no likelihood that Defendants will achieve the HSA goal near the February 2006 HSA expiration date, or within any reasonable time period after expiration.

Monitor's Report, 17-19 (Summary of the Monitor's Findings).

The Report concluded by urging the parties to resolve the non-compliance issues. But the parties could not. According to Defendants, they presented a written offer to Plaintiffs indicating that they were willing to accept, in whole or in part, eleven out of the fourteen recommendations made by the Monitor. On December 5, 2005, Plaintiffs responded that they could not accept

4

**United States District Court**
For the Northern District of California

Defendants' proposed terms and notified Defendants of their intent "to pursue enforcement remedies in federal court."

In response, Defendants filed their motion for entry of an order that they have discharged their obligations under the Agreement.  Two weeks later, Plaintiffs filed their motion for contempt and enforcement of the Agreement.  In their motion, Plaintiffs seek remedial enforcement measures, including a three-year extension of the term of the Agreement, and declaratory relief holding that voluntary race-conscious affirmative action is warranted and legally justified.

The Agreement was set to expire on February 14, 2006.  On February 10, 2006, after the hearing, the Court issued an order extending the Agreement for one year.

LEGAL STANDARD

This Court has the inherent power summarily to enforce a settlement agreement involving an action pending before it.  In re Suchy, 786 F.2d 900, 902-03 (9th Cir. 1985).  The interpretation and enforcement of a settlement agreement is governed by the legal principles applicable to contracts.  United Commercial Ins. Serv., Inc. v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir. 1992).

DISCUSSION

I.   Monitor's Report

Defendants argue that the Monitor's Report is not properly before the Court; they contend that Plaintiffs treat the Monitor's Report as if it were an initial ruling that is appealed to this Court.  It is not.

Plaintiffs cite Federal Rule of Civil Procedure 53, noting

5

that it requires the Court to decide de novo all objections to the Monitor's findings of fact and conclusions of law.  Rule 53 provides that, unless a statute provides otherwise, a court may appoint a master only to "perform duties consented to by the parties."  Fed. R. Civ. P. 53(a)(1)(A).  The Agreement does not provide that a Monitor's Report will be presented to the Court.  Defendants contend that they did not agree that the Monitor would present a Report and recommendation to the Court.  Plaintiffs respond that the Monitor's Statement of Work, prepared by the parties, provides, "The Monitor may meet with and report to the Court if directed by the Court."

    Although the Court did not "direct" the Monitor to report to the Court, the Court finds her report useful and wishes to consider it.  Defendants have had the opportunity to counter her factual statements and respond to her legal conclusions.  The Court has considered Defendants' positions, as well as the Monitor's Report, and reached its own findings and conclusions.

II.  Agreement

    The Agreement provides that any motion before this Court for enforcement shall be limited to enforcement of the provisions contained in Sections IV and VIII.  The Agreement further states that in a Court proceeding to enforce compliance with Section IV, Defendants shall not be found in breach of the Agreement, and the Court shall not order further relief, if the Court finds that Defendants have substantially complied with Section IV.B through G and Section V, or any alternative methods of implementation agreed upon by the parties, and have nonetheless been unable to reach the

goals of Section IV.A.  If the Court finds that Defendants are in breach, however, the Agreement provides that the Court may order specific enforcement of the provisions contained in Section IV.B. through IV.G., additional remedial measures to increase Hispanic representation subject to the availability of Region 5 positions, any alternative provisions agreed upon by the parties, and/or a one-time, one-year extension of the Term of the Agreement.

A.   Contempt/Breach of Agreement

Plaintiffs contend that Defendants have breached the Agreement and thus are in civil contempt.  For this Court to find contempt, Plaintiffs must show by clear and convincing evidence that Defendants violated a specific and definite order of the Court. Stone v. City and County of San Francisco, 968 F.2d 850, 856 n.9 (9th Cir. 1992).  The burden then shifts to Defendants to demonstrate why they were unable to comply, and to show they took every reasonable step to comply.  Id.  While "there is no good faith exception to the requirement of obedience to a court order," a party should not be held in contempt if its actions appear to be based on a good faith and reasonable interpretation of the court's order; substantial compliance with the court order is a defense to civil contempt.  In re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993).

Defendants argue that, not only are they not in contempt, the Agreement does not allow Plaintiffs to move for contempt.  They note that the word "contempt" does not appear in the Agreement. Defendants point to language in the Agreement to argue that the parties agreed to limit the Court's retained jurisdiction solely to

7

**United States District Court**
For the Northern District of California

enforcing compliance of two sections: "The District Court will retain jurisdiction during the term of this Agreement for the purpose of enforcing compliance with Sections IV and VIII." HSA, § VII.A.  Plaintiffs do not address this argument in their reply. But, as they note in their moving papers, the Final Judgment Approving the Settlement Agreement is enforceable by this Court both as a judicial decree and as a voluntary agreement between the parties.[1]  And "courts have inherent power to enforce compliance with their lawful orders through civil contempt." Spallone v. United States, 493 U.S. 265, 276 (1990) (quoting Shillitani v. United States, 384 U.S. 364, 370 (1966)).

> 1.  Section IV

As noted above, Section IV of the Agreement, entitled Duties and Obligations, is enforceable.  Plaintiffs contend that Defendants are in violation of Sections IV.A.1, IV.C, IV.D and IV.G.

> a.  Section IV.A

According to this section, "It is the intention of Defendants to undertake and continue specific measures designed to eliminate barriers to hiring, promotion, and retention of Hispanics in the Region 5 workforce."  Subsection One states Defendants' goal: to increase Hispanic representation in the Region 5 workforce to a percentage equivalent to the percentage of Hispanics in the Applicable Labor Pool in the Relevant Geographic Area.  Subsection

---

[1]Defendants' argument that Plaintiffs cannot move for contempt is based solely on the language in the Agreement.  They do not argue that Plaintiffs cannot move for contempt because the Agreement is not a consent order.

United States District Court

For the Northern District of California

Two provides: "Nothing in this Agreement will obligate Region 5 to create new positions, to fill any particular position, or to promote, select, or assign any particular person to any particular position.  No provision of this Agreement is intended as, or may be construed as imposing, a quota."

Defendants contend that this section contains merely aspirational goals and thus it cannot be enforceable; they note that, unlike other sections in Section IV, this section does not contain the words "shall" or "will."  This is incorrect.  As Plaintiffs note, the Agreement itself, in the section on enforcement, expressly provides that the Court will be measuring breach by whether Defendants have been "unable to reach the goals of Section IV.A."  The Agreement also expressly provides that Section IV is enforceable; it does not divide Section IV into subsections that are enforceable and subsections that are not. Furthermore, the goal falls within the Duties and Obligations provision of the Agreement.  And it is not an impermissible quota; as the Supreme Court explained,

> Properly understood, a quota is a program in which a
> certain fixed number or proportion of opportunities are
> reserved exclusively for certain minority groups.  Quotas
> impose a fixed number or percentage which must be
> attained, or which cannot be exceeded, and insulate the
> individual from comparison with all other candidates for
> the available seats.  In contrast, a permissible
> goal . . . require[s] only a good-faith effort . . . to
> come within a range demarcated by the goal itself.

Grutter v. Bollinger, 539 U.S. 306, 335 (2003)(inner citations and quotations removed; alternations in original).

Not only is this section enforceable, it provides the benchmarks that Defendants claim are lacking in the Agreement,

9

making this case distinguishable from <u>Donnelly v. Secretary of U.S.</u>
<u>Department of Agriculture</u>, 95-C-4389-DLJ (N.D. Cal. Nov. 22, 2005),
which involved the Women's Settlement Agreement.[2]  The parties and
their experts dispute what these benchmarks currently are and what
information should be compared to the benchmarks.  Defendants
contend that, based on statistics provided by their experts, all
benchmark goals have been surpassed, and that there is now a
surplus of Hispanic representation in the overall Region 5
workforce.  But Plaintiffs claim, based on their experts' studies,
that Hispanics continue to be under-represented; they note that
there are only ten more Hispanic permanent employees in Region 5
than there were at the beginning of the Agreement.  Two issues are
predominantly responsible for the parties' diverging views:
(1) whether to include Student Career Employment Program positions
in the GS-462 Forestry Technicians job series and (2) how to
determine the Recruitment CLF Data based on the 2000 Census.

> i.   Inclusion of Student Career Employment
>      Program positions

According to Defendants, the Hispanic representation in the
Region 5 workforce from October 1, 2002 (a few weeks before the
Court approved the Agreement) to December 3, 2005, increased from
8.9 percent to 12.5 percent.  Plaintiffs contend this increase is
based on the inclusion of Student Career Employment Program
positions within the permanent workforce; not including those

---

[2]Plaintiffs further note that <u>Donnelly</u> was a settlement of
hostile environment/sexual harassment litigation, and did not
involve hiring or increasing women's representation in the
workforce.

**United States District Court**
For the Northern District of California

positions, the Hispanic workforce in Region 5 has remained approximately nine percent throughout the three-year settlement period.

The Student Career Employment Program provides a system whereby students can train to become career Forest Service Employees.  These apprentices, or SCEPs, have the potential to become permanent employees upon graduation, if SCEP requirements are met and appropriate positions are available.  Unlike permanent employees, however, SCEPs generally have no procedural or appeal rights.  In May, 2004, Defendants hired 245 Hispanic SCEPs; by October, 2005, only 143 remained.

Defendants do not dispute that the inclusion of SCEPs substantially increases the percentage of Hispanic representation in the Region 5 workforce overall and the GS-462 Forest Technician job series specifically; nor do Defendants deny the SCEPs' high attrition rate.  Nonetheless, Defendants argue that SCEPs are properly included in the data to analyze Hispanic representation and to determine if their goals have been met.  Defendants note that they have always included SCEPs in their data, and that SCEPs were included in their baseline data when the parties negotiated the HSA, a fact Plaintiffs do not dispute.  Defendants' expert states that temporary or trainee employees, like SCEPs, are not excluded from the CLF data, discussed below, which is based on all types of employees, including those in jobs that will not lead to a long-term career.  Defendants further point to the language in the Agreement that requires them to keep track of the number and percentage of Hispanics admitted into the Region 5 SCEP and to

11

1  recruit from that program.

2     The Monitor, however, rejected Defendants' reasons for

3  including SCEPs in the permanent workforce statistics and did not

4  include SCEPs in determining the representation of Hispanics in

5  permanent jobs.  Plaintiffs urge this Court to do the same.

6     It is true that, as noted above, SCEPs were included as

7  permanent employees in the baseline percentages of the Agreement

8  and in the early monitoring reports.  But, as the Monitor noted,

9  the data shows that the difference between the percentages of

10 Hispanic employees with and without SCEPs in the early monitoring

11 reports is de minimis.  Furthermore, the Agreement makes clear that

12 permanent employees and SCEPs are not treated the same; they are

13 included in separate categories.  The language in the Agreement

14 regarding what information needs to be in the monitoring report

15 demonstrates this: Defendants are required to collect information

16 regarding permanent employees, information regarding positions,

17 information regarding promotions, information regarding the average

18 grade of employees, and information regarding SCEPs.

19    Although the Agreement makes clear that SCEPs are not

20 permanent employees, the goal in Section IV.A.1 is "to increase

21 Hispanic representation in the Region 5 workforce"; it does not

22 specify whether this goal applies only to permanent employees.

23 Nonetheless, based on the language of the Agreement and the

24 dwindling numbers of SCEPs, the Court will not include the SCEPs in

25 the permanent workforce statistics.  And Defendants' argument, that

26 even excluding the SCEPs there was a substantial increase in

27 Hispanic representation, is not persuasive: using Defendants'

28                              12

numbers, on December 22, 2002, the Hispanic representation was 8.9 percent (466/5,252) and on December 31, 2005 it increased to 9.9 percent (476/4829).  As Plaintiffs and the Monitor note, without including the SCEPs, there has been little, if any, progress toward the goal of Section IV.A.1 of the Agreement.

ii.   2000 CLF Data

In Exhibit B to the Agreement, the parties agreed on the percentages for each Civilian Labor Force job based on the 1990 Census; these percentages establish the series-specific CLF workforce parity goals.  The Agreement states that "Defendants shall provide this information using the 1990 EEOC Civilian Labor Force Data until the 2000 EEOC Civilian Labor Force Data is available."  HSA, § II.A.1(c).  Now that the 2000 EEOC Civilian Labor Force Data is available, the parties disagree over the correct percentages based on the new information.  As Plaintiffs note, this disagreement arises because the Census Bureau made numerous changes in the code numbers, labels and detailed contents of its occupational categories in the 2000 Census.  Although the parties disagree as to how the 1990 percentages should be updated, the parties agree that the GS-462 Forestry Technician job series is the most important to analyze because employees in that series account for approximately half of Region 5's workforce.[3]  The agreed-upon CLF percentage for this job series based on the 1990 Census was 21.3 percent.  Plaintiffs contend that the updated CLF

_____

[3]The Monitor noted that the parties agree on the 2000 CLF percentages in almost half of the thirty series listed and differed by one percent or less in several others.

United States District Court
For the Northern District of California

percentage is 33.8 percent; the Monitor agreed.  Defendants, however, contend that 15.1 percent is the correct updated percentage.

Before addressing how the parties arrived at their differing percentages, Defendants argue that the Agreement provides that Defendants, not Plaintiffs, are to provide the relevant EEOC-CLF data.  The Agreement does state the "Defendants shall provide" EEOC-CLF data.  But nowhere does the Agreement provide, or even suggest, that Defendants alone shall determine the appropriate 2000 Census revisions to Exhibit B.  Although Plaintiffs do not address this argument, the Monitor rejected it.  The Court also rejects Defendants' argument that they alone can provide the updated percentages.

Plaintiffs hired an expert, Dr. Marc Bendick, to determine the updated percentages based on the 2000 Census.  To determine the correct percentage for the Forestry Technician occupation group, which was no longer used in the 2000 Census, Dr. Bendick used a weighted average of the Hispanic representation in three occupation codes: 196, Miscellaneous Life, Physical, and Social Science Technicians; 612, Forest and Conversation Workers; and 21, Farmers and Ranchers.

Defendants, however, assert that the appropriate comparison, or crosswalk, as the parties call it, for the missing Forestry Technician occupation group is occupation code 196, and that the updated percentage should be based on that code alone.  Defendants contend that the EEOC affirmed their analysis; though, as the Monitor noted, the EEOC provided only "general guidance" that

United States District Court
For the Northern District of California

agreed with Defendants' results.  After the Monitor issued her report, Defendants hired an expert, Dr. Claudia A. González Martínez, who agreed with Defendants that occupation code 196 provides the correct updated percentage.  Dr. González then adjusted occupation code 196 to account for citizenship and English proficiency -- qualifications Defendants state are necessary to work for Region 5 -- to reach Defendants' updated CLF percentage of 15.1 percent.

But, as Plaintiffs and their experts note, there are problems with using only code 196.  For example, Dr. Bendick asserts that code 196 corresponds to only twenty-seven percent of the 1990 Forestry Technician occupation.  Dr. Bendick notes that, given the increase in the Hispanic population in Region 5, it is highly improbable that the CLF workforce parity goal for the Forestry Technician job series would decrease over the decade; under Defendants' calculations, however, the goal drops from 21.3 percent to 15.1 percent.  Furthermore, there is a wide range of positions in the GS-462 job series, from "paper and pencil" jobs, requiring supervisory skills and possibly a college degree, to "pick and shovel" jobs, requiring a high school degree and the ability to move dirt, suppress fires, chop brush and maintain hiking trails.  Using only code 196 would ignore the diversity of GS-462 positions and the fact that many position descriptions do not require performing data analysis and report-writing.

Plaintiffs also contend that there are problems with Defendants' use of English proficiency and U.S. citizenship.  Plaintiffs note that the parties did not agree to adjust the data

15

United States District Court

For the Northern District of California

to account for those two factors and that it is not clear whether adjustment for language ability is appropriate in all job series. They further note that SCEPs need only be lawfully admitted to the United States; SCEPs need not be citizens before they convert to permanent positions. Because the Court is not including SCEPs in the permanent workforce statistics, however, citizenship requirements for SCEPs are irrelevant; Plaintiffs point to no other GS-462 position that does not require U.S. citizenship.

The Court finds that Plaintiffs' updated percentage is preferable to Defendants'. But the Court agrees with Defendants that the applicable labor pool means those individuals representing the relevant civilian labor force who possess the qualifications corresponding to Region 5 job series and categories. Thus, these percentages must take into account citizenship and language ability. Plaintiffs state that the adjustments for language ability and citizenship result in inconsequential differences for the central issue of the level of under-representation of Hispanics. For the updated percentage for GS-462, the Court will use Plaintiffs' calculation that adopt Defendants' language ability and citizenship adjustments: 31.5 percent.

iii.     Under-representation in the Region 5 Workforce

The Court finds that Hispanics continue to be under-represented in the Region 5 workforce. As noted by Plaintiffs' expert, Dr. Louis R. Lanier, with or without SCEPs, with or without the citizenship and language ability adjustments, and using Defendants' most up-to-date workforce numbers, there remains a

16

statistically significant difference between Defendants' Hispanic workforce and the Hispanic workforce as a whole.

                    b.   Section IV.C

     This section requires that "Defendants will maintain a full-time Regional Recruitment Coordinator position, with the primary purpose of implementing the Recruitment Program set forth in Section V" and that the position will be funded at a level enabling the Coordinator to accomplish the objectives of this Agreement.  In their motion, Defendants state that the position of the Coordinator has been filled, or the duties performed, since shortly after the Monitor was hired.  Defendants list the five individuals who have filled the position, temporarily filled the position, performed the position's duties or assisted in performing the position's duties.

     The Monitor, however, found that Defendants did not maintain a full-time Coordinator, as required by the Agreement.  The Monitor described the multiple times she raised this issue with Defendants. The Monitor also noted that she had warned Defendants that, one and a half years into the Agreement, there was not a clear plan for what the full-time Coordinator would be doing.  While others may have been performing the Coordinator's duties in the absence of a full-time Coordinator, those duties were not being performed on a full-time basis.

     Defendants never state that they have had a full-time Coordinator, who implemented the Recruitment Program, as required by the Agreement.  Instead, Defendants merely state, "There is no dispute that Defendants have maintained the Regional Recruitment Coordinator (RCC) Position."  The Agreement, however, requires

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    more, and the Court finds that Defendants are not in substantial

2    compliance with this section.

3                        c.    Section IV.D

4         This section requires that Defendants make a good faith effort

5    to maintain and fill the position of Region 5 Civil Rights

6    Director, during the term of the Agreement.  To show their

7    compliance, Defendants list five individuals who have held that

8    position, one of whom was the Acting Director for less than two

9    months.  Defendants contend that filling a position with acting

10   directors, while a permanent director is sought, is good faith

11   compliance.  Plaintiffs disagree, as did the Monitor.

12        The Monitor noted that for eleven months in 2003 and 2004

13   there were either short-term detailers or an acting director in the

14   Civil Rights Director position.  The Monitor acknowledged that

15   there may be situations when a Director's duties are effectively

16   performed by various acting or detailed personnel, but found that

17   was not the case in this situation.  When the first Director

18   retired, she was replaced by an Acting Director, who was unfamiliar

19   with issues involving the Agreement and retired after few months.

20   The next Acting Director left after two months.  The position was

21   not filled with a permanent director until almost a year after the

22   first director retired, despite the urgent need, and repeated

23   requests by the Monitor, to fill the permanent position.

24        Good faith requires more than merely filling the position with

25   several individuals serving as Acting Civil Rights Director.  The

26   Court finds that Defendants did not exercise the requisite good

27   faith and thus are not in substantial compliance with this section.

28                                  18

**United States District Court**
For the Northern District of California

1          d.   Section IV.G

2     This section requires that Defendants make a good faith effort

3 to provide sufficient resources to meet their obligations under the

4 Agreement.   Defendants state that they have spent a substantial

5 amount of money implementing the Agreement.   Plaintiffs do not

6 dispute that Defendants have provided sufficient resources; but

7 they argue that a good faith effort includes an obligation to

8 allocate the funding in a manner designed to meet the Agreement's

9 goals.   Plaintiffs complain about the consulting firms that

10 Defendants hired to publish narrative reports not required by the

11 data-production requirements of the Agreement.   But, as Defendants

12 note, the Agreement does not require Defendants to allocate

13 resources as prescribed by Plaintiffs.   The Court finds that

14 Defendants are in substantial compliance with this section.

15          2.   Section V

16     Although the Court determines that Defendants have not met

17 their stated goal in Section IV.A.1, the Court, as noted above,

18 cannot find Defendants in breach if they substantially complied

19 with the rest of Section IV and Section V.

20     As determined above, Defendants are not in substantial

21 compliance with Sections IV.C and IV.D; but they are in substantial

22 compliance with Sections IV.B, IV.E, IV.F and IV. G.   The Court

23 will now examine whether Defendants are in substantial compliance

24 with Section V, entitled Methods of Implementation.   Plaintiffs

25 contend that Defendants are not in substantial compliance with

26 Sections V.A and V.B.   Plaintiffs do not dispute Defendants'

27 compliance with Section V.C.

28                              19

United States District Court

For the Northern District of California

1            a.   Section V.A.

2       Plaintiffs argue that Defendants are not in substantial

3  compliance with subsections 1, 2 and 3; they do not dispute

4  Defendants' compliance with subsections 4 and 5.

5                  i.   Section V.A.1

6       This subsection provides, "The Regional Program includes

7  components that are designed (1) to disseminate effectively

8  information related to employment opportunities and (2) to increase

9  the diversity of the applicant pool by engaging in recruitment

10 activities, both government-wide and externally."  Defendants

11 contend that they are in substantial compliance with this provision

12 because they have developed and implemented a Regional Recruitment

13 Program, which includes an Outreach and Recruitment Strategy with

14 the goal of attracting, hiring and retaining "talented employees in

15 order to sustain a skilled and diverse Regional workforce."

16 Defendants point to activities they have funded, such as hiring an

17 outside contractor to recruit for Region 5 positions and funding a

18 full-time Student Career Employment Program coordinator.

19      Plaintiffs, however, note that Section V.A.1 required

20 Defendants promptly to implement a recruitment and outreach program

21 and to ensure it is effective, but that, as the Monitor stated,

22 "That has not occurred."  Monitor's Report, 37.  The Outreach and

23 Recruitment Strategy was not effectively disseminated until early

24 2005.  The Monitor acknowledged that Defendants were successful in

25 recruiting a diverse applicant pool for the fire apprentice hiring,

26 but found that "it was a one-time event -- not an effective

27 Regional Recruitment Program -- and it involved only entry level

28                              20

United States District Court

For the Northern District of California

student trainee positions." Monitor's Report, 49. Except for student apprentice hiring, Defendants' data does not show that Region 5 is having any success in getting a more diverse applicant pool.

Nor do Defendants assert that their applicant pool has become more diverse. Defendants again cite Donnelly, but, as noted above, this case is distinguishable from Donnelly. Here, the Agreement, specifically Exhibit B, provides measures to evaluate effectiveness. Defendants accuse Plaintiffs of presenting no evidence that information about employment opportunities is not being effectively disseminated; yet, Defendants provide no evidence that any of its programs are designed to, or have, increased the diversity of the applicant pool.

Furthermore, late compliance is not substantial compliance. While the Agreement did not provide a specific time table for completion of tasks, Defendants cannot expect to be found in substantial compliance when they have implemented measures only recently and thus have been unable to determine the effectiveness of these measures. Even in Donnelly, which Defendants urge this Court to follow, the court extended the term of the settlement agreement for an extra year due to "start-up delays." The Court finds that Defendants are not in substantial compliance with this provision.

ii. Section V.A.2

This subsection provides, "Region 5 will monitor all recruitment and promotion actions of Forest Supervisors and Regional Office Directors and all recruitment and promotion actions

taken under their supervision."  Defendants state that they are

monitoring all the recruitment and promotion actions as required by

this provision.  But Plaintiffs note that the form used by

Defendants was not even disseminated to the field until

February, 2005.  Plaintiffs also note the Monitor's finding that

Defendants' belated monitoring procedures do not constitute

substantial compliance with this section.

As the Monitor found,

> having recently implemented a policy does not address the
> fact that, for several years, Region 5 filled positions
> without the required monitoring of recruitment and
> promotions.  While the RRC has reviewed a small number of
> positions under the new oversight policy, according to
> the HSA reports, Region 5 has filled more than 4,000
> positions from October, 2002, to October, 2004, all of
> which were filled well before the oversight policy was
> put in place.  Moreover, simply having a policy in place
> does not mean that the oversight is occurring or is being
> done effectively.

Monitor's Report, 35 (inner citation omitted).  The Monitor further

found that, while Defendants made a commitment to do monthly

reviews and reports, they have been unable to carry that out.

The Court finds that Defendants are not in substantial

compliance with this section.

                    iii.  Section V.A.3

This section provides, "Defendants shall employ the Outreach

and Recruitment Procedures using the Employment Outreach and

Recruitment Documentation, attached as Exhibit C . . . in any

action to fill a vacancy through competitive processes for a Region

5 Position.  Prior to the final selection for a Region 5 Position,

the selection certificate and supporting paperwork will be reviewed

by the unit Human Resource Officer."  Defendants state that the

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

parties, with input from the Monitor, designed a new, more effective Exhibit C.  According to Defendants, they first used the old Exhibit C and then used the new Exhibit C.

Plaintiffs do not dispute Defendants' use of Exhibit C, either in its old or new form.  Instead, they note that the new form contains "checkpoints," or specific times during the hiring process when procedures must be reviewed to determine, for example, whether the applicant pool is sufficiently diverse.  The checkpoints require access to race and national origin data.  But, as the Monitor noted, until late September, 2005, the only point at which Defendants had access to that data was six days prior to the closing of the vacancy announcement; data on applicants who applied in the last six days of the opening was not available.  Because Defendants could not fully evaluate the checkpoint system or the revised form due to the unavailability of data, the Monitor determined that Defendants were not in substantial compliance with Section V.A.2.  The Court agrees; as noted above, last-minute compliance is not substantial compliance.  The Court finds that Defendants are not in substantial compliance with this section.

b.   Section V.B

This section describes the duties of the Regional Recruitment Coordinator: (1) coordinating outreach and recruitment; (2) being knowledgeable in Region 5's hiring practices; and (3) making regular presentations.  The section further describes the information that the Coordinator needs to be able to access. Defendants state that the Coordinator is responsible for monitoring Region 5's outreach and recruitment strategies and action plans and

23

United States District Court

For the Northern District of California

makes presentations at Regional Leadership Team meetings, which are held at least three times a year.  In addition, Defendants contend that the Coordinator has access to all the data listed in this section.

Plaintiffs disagree that the Coordinator has undertaken the duties described in this section or has access to the required information.  They quote from the Monitor's Report that, after concluding that Defendants were not in substantial compliance with V.B.1, stated:

> The RRC position has not been filled on a full time basis throughout the HSA and has not been funded at a level enabling the incumbent to accomplish the objectives of the HSA.  The various individuals in the RRC position have not effectively been in the role of <u>coordinating</u> the Region's outreach and recruitment or otherwise in charge of the Regional Recruitment Program.

Monitor's Report, 31 (emphasis in original).  Plaintiffs further note that some of the information required to be available to the Coordinator was not accessible.

In response, Defendants contend that Plaintiffs failed to counter their evidence that the Coordinator has carried out the responsibilities outlined in this section.  But Defendants did not provide evidence that the Coordinator organized and oversaw outreach or recruitment; nor did Defendants provide evidence that the Coordinator was knowledgeable about hiring practices.  Vicki Johnson's declaration states, in a conclusory fashion, that the Coordinator has carried out the responsibilities outlined in this section, but the declaration does not specify anything that the Coordinator organized, oversaw or coordinated.  Instead, the declaration states that the Coordinator monitored and performed a

24

full range of internal and external recruitment and placement
duties.   In addition, the declaration is silent as to the
Coordinator's knowledge of hiring practices.   Defendants also
respond that the data issues now have been resolved, so that the
Coordinator has access to all the required information.   This is
not sufficient to show that Defendants are in substantial
compliance with this section; the Court finds that they are not.

    B.   Enforcement

    Although Plaintiffs show that Defendants are not in
substantial compliance with various provisions of the Agreement,
Plaintiffs have not proven contempt by clear and convincing
evidence.   The Court does not find that Defendants are in contempt,
but it does find that Defendants are not in substantial compliance
with Sections IV.B through IV.G and Section V as a whole and
specifically that Defendants are in breach of Sections IV.A, IV.C.
and IV.D.   Accordingly, the Court will order further relief.   As
noted above, the Agreement provides that if the Court finds that
Defendants are in breach, "the Court may order specific enforcement
of the provisions contained in Section IV.B. through G., additional
remedial measures to increase Hispanic representation subject to
the availability of Region 5 Positions, any alternative provision
agreed upon by the parties, and/or a one-time, one-year extension
of the Term of the Agreement."   Even without this language, the
Court has the inherent power to enforce this Agreement.   TNT
Marketing, Inc. v. Agresti, 796 F.2d 276, 278 (9th Cir. 1986)
("district court had inherent power to enforce the agreement in
settlement of litigation before it").

The Court will enforce this Agreement; however, it will not modify the Agreement.  Plaintiffs argue that the Court can order the relief sought through either enforcement or modification.  But, as both parties note, for the Court to modify this Agreement, Plaintiffs must first establish a significant change, in either factual conditions or in the law, requiring modification; then the Court must determine whether the requested modification is "suitably tailored" to resolve the issues created by the changed circumstances.  See Keith v. Volpe, 784 F.2d 1457, 1460 (9th Cir. 1986).  Plaintiffs contend that the scope of Defendants' failure to comply with the Agreement alone provides grounds for modification as a changed circumstance.  The two out-of-circuit cases they cite, however, do not support that argument.  As Defendants note, those cases present egregious circumstances not present here.  For example, in Thompson v. U.S. Department Of Housing & Urban Development, 404 F.3d 821, 828 (4th Cir. 2005), the court found that the defendants had "done almost nothing that they were required to do."  (Emphasis in original.)  Here, Plaintiffs do not dispute that Defendants have complied with several provisions, such as those dealing with training and retaining the Monitor.

The only changed circumstance that Plaintiffs point to is the National Forest Service's consolidation of all human resources personnel in Albuquerque, New Mexico.  While this could classify as a significant changed circumstance, the Court, as discussed below, without modifying the Agreement, can order that Defendants ensure that there will be sufficient human resources personnel in Region 5 to implement the Agreement effectively.  Thus, the Court finds that

United States District Court

For the Northern District of California

1  modification of the Agreement is inappropriate.

2       C.   Relief

3       Pointing to the language in the Agreement that allows the

4  Court to order "additional remedial measures to increase Hispanic

5  representation," Plaintiffs request that Defendant be required to

6  implement the following measures recommended by the Monitor:

7  (1) extending the Agreement for three years; (2) contracting with

8  an effective outside recruiter; (3) establishing a fire apprentice

9  mentoring program; (4) advertising all positions as inter-

10 disciplinary and multi-grade; (5) expanding the Central California

11 Consortium; (6) creating a Selection Review position;

12 (7) establishing short-term benchmarks; (8) tracking previously

13 qualified Hispanic applicants for recruitment and outreach

14 purposes; (9) providing identifying race and national origin

15 information to hiring officials for voluntary use as a selection-

16 plus factor in job series where Hispanics are under-represented;

17 (10) retaining and providing data on the race and national origin

18 of applicants for temporary fire-related positions; and

19 (11) notwithstanding the upcoming move of Human Resource staff to

20 Albuquerque, New Mexico, retaining local human resources personnel

21 sufficient to carry out all recruitment activities related to

22 effective implementation of the Agreement.  Defendants argue that

23 Plaintiffs take the "additional remedial measures" language out of

24 context and that Plaintiffs ask this Court to put into place a new

25 settlement agreement, one not bargained for by the parties.

26       1.   Three-year extension of the Agreement

27       As noted above, the Agreement provides for a one-time, one-

28                                    27

United States District Court

For the Northern District of California

year extension to the term of the Agreement.   The Monitor recommended that Defendants voluntarily agree to add another two years to this provision, making a three-year extension to the Agreement.   Defendants contend that this relief contravenes the agreed upon one-year extension in the Agreement.   Plaintiffs contend that a two-year extension is a permissible "additional remedial measure" to increase Hispanic representation.   Plaintiffs also argue that the Court has the power to modify the Agreement. However, as noted above, the Court will not do.

As the Ninth Circuit has instructed, "'[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purpose of one of the parties' or by what 'might have been written had the plaintiff established his factual claims and legal theories in litigation.'" San Francisco NAACP v. San Francisco Unified Sch. Dist., 896 F.2d 412, 413 (9th Cir. 1990) (alteration in original) (quoting United States v. Armour & Co., 402 U.S. 673, 682 (1971)).   The parties agreed to limit the extension of the Agreement to one year.   Thus, without modifying the Agreement, the Court can only order a one-year extension of the term of the Agreement.

2.   Contracting with an effective outside recruiter

Defendants argue that this request, which requires Defendants to evaluate the effectiveness of their outside recruiter and allows the Monitor to determine whether the recruitment services are sufficient, contravenes the Agreement, which gives Region 5 control over its Recruiting Program.   But that control is found in Section V.A, a section with which Defendants did not substantially comply.

28

The Court finds that granting this request is an appropriate additional remedial measure to increase Hispanic representation.

### 3.   Fire apprentice mentoring program

The Monitor notes that Defendants stated that they accepted the Monitor's recommendation to implement an effective mentoring program.  Defendants have done so, revising their existing formal Mentoring Program to add a component for new employees with less than one year of service.  Plaintiffs do not dispute that a mentoring program for fire apprentices is currently in place.  The Court orders Defendants to continue this program.

### 4.   Advertising of all positions as inter-disciplinary and multi-grade

Plaintiffs request that Defendants be ordered to advertise all positions as multi-grade, and to issue inter-disciplinary announcements, in order to attract a broad applicant pool which will effectuate the purposes of the Agreement.  Defendants contend that to do so would violate a United States Forest Service policy (issued November 30, 2005), which provides that a single position description can no longer be classified or advertised in broad inter-disciplinary series, except in limited circumstances.  Under the policy, Defendants may classify and advertise a position in two series if there is a logical pairing of series that directly correlate to the work performed.  Plaintiffs do not address this policy change.  The Court will not order Defendants to violate a Forest Service policy: Defendants are ordered to advertise all positions as multi-grade and to issue inter-disciplinary announcements whenever consistent with this policy, i.e., if there

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  is a logical pairing of series that directly correlate to the work
2  performed.

3        5.  Expanding the Central California Consortium

4        The Central California Consortium is an environmental
5  education, outreach and recruitment program for students that is
6  sponsored by the Forest Service and Region 5.  Based on the success
7  of this program, the Monitor recommended that Defendants expand the
8  activities of the Central California Consortium to at least two
9  additional locations.  Defendants complain that this relief
10 contravenes their control over their own recruiting program and
11 that seeking this relief contradicts Plaintiffs' exclusion of SCEP
12 positions from their analysis of Hispanic representation in the
13 workforce; the CCC only recruits SCEPs and temporary student
14 employees.  Given the success of this program, the Court grants
15 this request.

16        6.  Creating a selection review position

17        Plaintiffs ask the Court to order Defendants to create and
18 fund an independent selection review position to be filled by a
19 person selected by and supervised directly by the Monitor.
20 Defendants argue that this request contravenes the Agreement, which
21 provides that "Region 5 will monitor all recruitment and promotion
22 activities."  HSA, § V.A.2.  Region 5 may do so; this is not
23 inconsistent with additional monitoring.  As the Monitor noted,
24 Defendants were backlogged on selection reviews and have determined
25 that the Coordinator does not have time to do the reviews.  The
26 Monitor found that an individual responsible for independent
27 selection review will not result in Defendants ceding their hiring

28                              30

**United States District Court**

For the Northern District of California

1    authority to someone outside the department, but it will ensure

2    that there is a consistent and timely review of Defendants'

3    established procedures so barriers to increased Hispanic

4    representation can be identified and addressed.  The Court grants

5    this relief.

6           7.  Establishing short-term benchmarks

7         Plaintiffs request that the Court order the parties to meet

8    with the Monitor within thirty days of this order to establish

9    short-term benchmarks for progress toward the HSA goal of

10   increasing Hispanic representation in the Region 5 workforce.

11   These benchmarks would chart the employment levels of Hispanic

12   employees.  Defendants claim that this relief is unconstitutional

13   because it creates a race-based classification that does not pass

14   strict scrutiny.  The Court denies this request.

15           8.  Tracking of previously qualified Hispanic
               applicants for recruitment and outreach purposes
16

17        Plaintiffs request that the Court order Defendants to create,

18   within thirty days from this order, a database that can identify

     previously qualified Hispanic applicants for employment in Region 5
19
     who were not selected for positions, for the purpose of outreach
20
     and recruitment for future available positions.  The Court denies
21
     this request.
22
             9.  Providing identifying race and national origin
23               information to hiring officials for voluntary use as
                 a selection-plus factor in job series where
24               Hispanics are under-represented

25        Plaintiffs state in their reply that they are not asking the

26   Court to order Defendants to provide identifying race and national

27   origin information to hiring officials or to instruct their hiring

28                                    31

United States District Court

For the Northern District of California

officials that they may consider race and national information as a "plus factor" in filling positions where Hispanics are under-represented.  Rather, Plaintiffs seek a determination from this Court that the voluntarily use of race and national origin as a "plus factor" to select among qualified applicants in under-represented jobs series is constitutional.  The Court will discuss this below.

          10.   Retaining and providing data on the race and national origin of applicants for temporary fire-related positions

Plaintiffs ask the Court to order Defendants to provide the Monitor with data on the race and national origin of applicants for temporary fire-related job positions.  Defendants note that this was not on the list of data which the Agreement required that Region 5 provide; nor is a temporary fire-related position a "Region 5 position," as that term is defined in the Agreement. Furthermore, Defendants again contend that this request is inconsistent with Plaintiffs' exclusion of SCEPs from their analysis of Region 5's progress on increasing Hispanic representation in the permanent workforce.  But, as the Monitor noted, permanent entry-level fire-related positions have traditionally been filled by employees with past experience as temporary employees.  Thus, the Court finds that this is also an appropriate remedial measure and grants this request.

          11.   Retaining human resources personnel sufficient to carry out all recruitment activities related to effective implementation of the Agreement

In response to the Forest Service's consolidation of all human resource positions in Albuquerque, New Mexico, as discussed above,

United States District Court

For the Northern District of California

Plaintiffs request that the Court order that Defendants are to ensure that Region 5 retains on each forest and in the Regional Office of Region 5, human resources personnel sufficient to carry out all recruitment activities related to the effective implementation of the Agreement.  Defendants contend that this request is too broad; nonetheless, they note that Region 5 received a waiver from the Forest Service and that the human resources staffing and recruitment functions of Region 5 will only be moved to Albuquerque when the Agreement ends or when the Human Resources staff has demonstrated the capacity successfully to perform the work required in meeting the duties and obligations of the Agreement.  The Court finds that Plaintiffs' request is an appropriate remedial measure and that, because of the waiver, Defendants will not be in violation of Forest Service directives and policy on workforce planning if this request is granted.  Therefore, the Court grants this request and orders that, until the Agreement ends, Defendants are to retain, on each forest and in the Regional Office of Region 5, human resources personnel sufficient to carry out all recruitment activities related to implementing the Agreement and this order.

III.  Race as a Plus Factor

As noted above, Plaintiffs request that the Court declare that the voluntary use of race and national origin as an optional plus factor, to select among qualified applicants in job series in which Hispanics are under-represented, is constitutionally permissible. Plaintiffs emphasize that Defendants' workforce has been persistently imbalanced for over a decade; this is the second

United States District Court

For the Northern District of California

settlement agreement that has tried and failed to address the low representation of Hispanics in Defendants' workforce.  Plaintiffs contend that, armed with such a determination from this Court, Defendants could engage in voluntary, lawful and effective efforts to remedy past discrimination which has resulted in long-standing workforce disparities.  But, Defendants have made clear that, even if the Court were to make such a determination, they do not wish to use race and national origin as a plus factor, and they do not believe that there has been past discrimination.

All racial classifications imposed by the government must be analyzed by a reviewing court under strict scrutiny.  Grutter, 539 U.S. at 326.  Under the strict scrutiny standard, a race-based classification is permissible only if it serves a compelling government interest and is narrowly tailored to meet that interest. See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 235 (1995).  The Supreme Court recently instructed, "Not every decision influenced by race is equally objectionable and strict scrutiny is designed to provide a framework for carefully examining the importance and sincerity of the reasons advanced by the governmental decision maker for the use of race in the particular context."  Grutter, 539 U.S. at 327.

A.  Compelling government interest

Both parties agree that a gross statistical disparity can satisfy a prima facie standard for discrimination and form the strong basis in evidence warranting affirmative action.  See, e.g., City of Richmond v. J.A. Croson Co., 488 U.S. 469, 501 (1989). Plaintiffs' statistics show a gross disparity in some of the job

34

United States District Court

For the Northern District of California

series and could justify Defendants finding that there was past
discrimination by the government.  Cases involving affirmative
action contemplate a voluntary finding of past discrimination.  See
Johnson v. Transportation Agency, 480 U.S. 616, 620 (1987)
(voluntary assumption by the State agency that an affirmative plan
was justified to "remedy the effects of past practices").  Thus, a
court finding of discrimination by the government is not required
to justify voluntary affirmative action; voluntary findings of past
discrimination by a government agency suffice.  See id; Ho v. San
Francisco Unified Sch. Dist., 965 F. Supp. 1316, 1324 (N.D. Cal.
1997) (citing Wygant v. Jackson Board of Educ., 476 U.S. 267, 289
(1986) (O'Connor, J., concurring in part) ("a contemporaneous or
antecedent finding of past discrimination by a court or other
competent body is not a constitutional prerequisite to a public
employer's voluntary agreement to an affirmative action plan,"
because a constitutional violation "does not arise with the making
of a finding; it arises when the wrong is committed").  Even though
there is sufficient evidence to justify Defendants voluntarily
finding past discrimination in their former hiring practice,
Defendants, at the hearing and in their papers, deny any past
discriminatory practices.  To support a compelling government
interest, there must be prior discrimination by the government;
findings of societal discrimination are not adequate.  Id. at 490-
91.  Plaintiffs have not attempted to prove past discrimination.
Because Defendants have made clear that they do not, and will not,
admit to past discrimination, it does not appear that the
government has a compelling interest in remedying it with

1  affirmative action.

2      B.   Narrowly tailored

3      Defendants note the Supreme Court's instruction that, because
4  racial classifications "are simply too pernicious to permit any but
5  the most exact connection between justification and
6  classification," the Court must conduct "a most searching
7  examination." Gratz v. Bollinger, 539 U.S. 244, 270 (2003).  The
8  Monitor conducted such an examination and concluded that the
9  optional plus factor recommendation was narrowly tailored.  In
10 reaching her conclusion, she examined the necessity for relief and
11 the efficacy of alternative methods, the flexibility and duration
12 of the relief, the relationship of the numerical goals to the
13 relevant labor market and the impact of the relief on the rights of
14 third parties.  She noted that Defendants had tried race-neutral
15 measures for years, with only limited success: data from the Forest
16 Service shows that Region 5 has increased its Hispanic permanent
17 employee representation by less than three percent in the past
18 fifteen years.  Furthermore, the proposed affirmative action
19 measure is flexible, of limited duration and takes into account the
20 impact on others.

21     Defendants argue that the use of race as a plus factor is a
22 quota and thus impermissible.  They attempt to distinguish this
23 case from Grutter by arguing that the use of race and national
24 origin as a plus factor here would result in a workforce with a
25 defined racial make-up.  This argument fails.  In Grutter, the
26 Supreme Court found that race was a legitimate plus factor because
27 it was used as one factor among many that the law school admissions

28                                36

**United States District Court**

For the Northern District of California

1  officers took into account; it was a factor that was not the

2  "defining feature" of any particular application and its use did

3  not guarantee a student body that bore a statistical relationship

4  to the make-up of the applicant pool.

5      The proposed affirmative action here is like that allowed in

6  Grutter: it would allow race and national origin to be considered

7  "flexibly as a 'plus' factor in the context of individualized

8  consideration of each and every candidate."  539 U.S. at 335.  All

9  qualified candidates would compete with other qualified candidates.

10  There would be no Hispanic quota; Plaintiffs' envisioned

11  affirmative action provides only the option of considering race and

12  national origin as a plus factor, not the obligation.  The Court

13  finds that the voluntary use of race and national origin as an

14  optional plus factor to select among qualified applicants in job

15  series where Hispanics are under-represented, for the limited time

16  that the Agreement remains in effect, like the use of race as a

17  plus factor in Grutter, would be narrowly tailored.

18      C.  Strict scrutiny

19      Because it appears that there is not a compelling government

20  interest, the Court denies Plaintiffs' request that it declare

21  that, in this situation, the voluntary use of race and national

22  origin as an optional plus factor, to select among qualified

23  applicants in job series in which Hispanics are under-represented,

24  is constitutionally permissible.

25                        CONCLUSION

26      For the foregoing reasons, the Court DENIES Defendants' Motion

27  For Entry of Order That Defendants Have Discharged Their

28                            37

Obligations Under the Settlement Agreement (Docket No. 94).  The
Court GRANTS IN PART Plaintiffs' Motion For Contempt and
Enforcement of Court-Approved Settlement Agreement (Docket No. 107)
and DENIES it IN PART.  Specifically, the Court finds that, while
Defendants are not in contempt, they are in breach of Sections
IV.A.1, IV.C and IV.D of the Agreement.  The Court will enforce the
Agreement.  The Court extends the term of the Agreement by one
year.  The Court further orders, as remedial measures to increase
the representation of Hispanics, that:

Defendants contract with an effective outside recruiter; in
order to do this, Defendants and the Monitor shall evaluate the
effectiveness of Defendants' recently hired outside recruiter,
Baitz.com;

Defendants continue their fire apprentice mentoring program;

Defendants advertise all positions as multi-grade and issue
inter-disciplinary announcements whenever possible, i.e., if there
is a logical pairing of series that directly correlate to the work
performed;

Defendants expand the activities of the Central California
Consortium to at least two additional locations;

Defendants create and fund an independent selection review
position; the individual who fills that position will be selected
by and supervised directly by the Monitor;

Defendants retain and provide data on the race and national
origin of applicants for temporary fire-related positions; and

Defendants retain, until the Agreement ends, human resources
personnel, sufficient to carry out all recruitment activities

United States District Court

For the Northern District of California

related to implementing the Agreement and this order, on each

forest and in the Regional Office of Region 5.

In addition, because the parties were unable to agree on a

reporting and enforcement procedure for the remainder of the

Agreement period, the Court directs the Monitor to propose a

reporting and enforcement procedure and submit it to the Court,

within twenty-one days from this order, for consideration.

IT IS SO ORDERED.

Dated:   3/30/06

_____
CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California

39